**INFINITI INFORMATION SOLUTIONS, LLC, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 09–750C.**

United States Court of Federal Claims.

Filed Under Seal April 2, 2010.

Reissued April 9, 2010.

Kathy C. Potter, Benton, Potter & Murdock, PC, Falls Church, Virginia, for plaintiff. With her on the briefs were Janine S. Benton, Benton, Potter & Murdock, PC, Falls Church, Virginia, and James DelSordo, Argus Legal, LLC, Manassas, Virginia.

Russell A. Shultis, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Kenneth M. Dintzer, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Gregory S. Walters and Gabriel G. Lopez, United States Department of Housing and Urban Development, Denver, Colorado.

## OPINION AND ORDER[1]

LETTOW, Judge.

This is a post-award protest of a contract to perform internet and intranet services for the Department of Housing and Urban Development ("HUD"), Office of Public and Indian Housing ("PIH"), issued pursuant to Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a). The contract, (No. C–DEN–02418), was awarded to Ideogenics, LLC ("Ideogenics") on September 29, 2009, and called for payment of $973,302.00 for the first year of services. The protestor, Infiniti Information Solutions, LLC ("Infiniti"), had been the incumbent contractor and was among the entities seeking the award of the new contract. After the award to its competitor, Infiniti filed a protest with the Government Accountability Office ("GAO"), which was denied. Thereafter, Infiniti filed its protest in this court.

The administrative record in this case was provided on November 20, 2009, and cross-motions for judgment on that record and a

---

1. Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before April 8, 2010. No redactions were requested. In connection with its response to the request regarding redactions, the government by motion sought correction of three clerical errors in the decision as filed under seal. That motion is granted and pertinent changes have been made.

motion to dismiss were submitted thereafter by the parties. Those motions have been fully briefed and were addressed at a hearing held on March 16, 2010. The case is now ready for disposition.

## FACTS[2]

### A. Small Business Act Requirements

The Small Business Act was enacted to "promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals" and to "clarify and expand the program for the procurement by the United States of articles, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals." 15 U.S.C. § 631(f)(2); see also 15 U.S.C. § 637(a)(5), (6) (defining "socially disadvantaged individuals" and "economically disadvantaged individuals"); John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 1429–32 (3d ed.1998) (explaining eligibility criteria for participation in the Section 8(a) program).

Section 8(a) authorizes the Small Business Administration ("SBA") to enter into procurement contracts with other federal agencies and to subcontract performance of these contracts to disadvantaged small businesses. See Pub.L. No. 85–536, § 8(a), 72 Stat. 384, 389 (1958) (codified as amended at 15 U.S.C. § 637(a)).[3] SBA's regulations governing the Section 8(a) program mandate that "[w]here practicable, simplified acquisition procedures should be used for 8(a) contracts at or below the simplified acquisition threshold." 13 C.F.R. § 124.501(a). Awards with a value exceeding $5,000,000 for manufacturing and $3,000,000 for all other contracts "must be competed among eligible Participants." 13 C.F.R. § 124.506(a)(1) (2009).[4] The PIH contract at issue in this case had an estimated value of $500,000 to $2,000,000, below the $3,000,000 threshold for competitive acquisitions, and thus simplified acquisition procedures could be employed. See AR 3–000021 to 000022 (HUD Forecast of Contracting Opportunities Products and Services (May 18, 2009)) ("May Forecast"); AR 3–000023 to 000024 (HUD Forecast of Contracting Opportunities Products and Services (June 8, 2009)) ("June Forecast").[5]

2. The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties' evidentiary submissions related to prejudice and equitable relief. See Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed.Cir.2005) (bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"); Santiago v. United States, 75 Fed.Cl. 649, 653 (2007) ("In accord with RCFC 52.1, the court 'is required to make factual findings ... from the [administrative] record as if it were conducting a trial on the record.' ") (quoting Acevedo v. United States, 216 Fed.Appx. 977, 979 (Fed.Cir.2007)).

Other findings of fact and mixed findings of fact and conclusions of law are stated in the analysis which follows.

3. Although a contract entered pursuant to Section 8(a) is technically a contract between the procuring agency and SBA, with a subcontract between SBA and the Section 8(a) participant, "[a]fter award, the relationships under an 8(a) contract are principally between the 8(a) firm and the procuring agency[,] ... [with] the SBA ... no longer directly involved." Cibinic & Nash, supra, at 1433. In this respect, by regulation, a subcontract between the 8(a) awardee and SBA provides that "the SBA has delegated responsibility ... for the administration of this subcontract to the [contracting agency] with complete authority to take any action on behalf of the Government under the terms and conditions of this contract." 48 C.F.R. § 52.219–12(b)(2).

4. "The Federal Acquisition Regulatory Council (FAR Council) has the responsibility of adjusting each acquisition-related dollar threshold on October 1 of each year that is evenly divisible by five." 13 C.F.R. § 124.506(a)(1). SBA's regulations were amended on September 14, 2009 to raise the threshold for manufacturing contracts to $5,500,000 and that for all other contracts to $3,500,000. See 74 Fed.Reg. 46885–01 (Sept. 14, 2009) (interim final rule with an immediate effective date) (amending and renumbering 13 C.F.R. § 124.506(a)(1) (2009) as 13 C.F.R. § 124.506(a)(2)).

5. "AR ——" refers to the administrative record filed with this court in accordance with RCFC 52.1(a). The administrative record has been subdivided into tabs. The first number and, where applicable, letter in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the particular page number of the administrative record, e.g., "AR 5A–000026." The pages of the administrative record are paginated sequentially without regard to the tabs.

References to the hearing conducted on March 16, 2010, will be to "Hr'g Tr. ——" without further annotation as to the date of the hearing.

The regulations permit SBA, "[w]here appropriate, [to] delegate the contract execution function to procuring activities," which pertinent governmental units must in turn "report all 8(a) contract awards, modifications, and options to SBA." 13 C.F.R. § 124.501(a). The delegated entity chooses the awardee, and the "contracting officer [of that entity] indicates his or her formal intent to award a procurement requirement as an 8(a) contract by submitting a written offering letter to SBA." 13 C.F.R. § 124.502(a). The "offering letter" must contain certain information, notably: (1) "[a] statement that prior to the offering no solicitation for the specific acquisition has been issued as a small business set-aside, or as a small disadvantaged business set-aside . . ., and that no other public communication (such as a notice in the Commerce Business Daily) has been made showing the procuring activity's clear intent to use any of these means of procurement"; and (2) an "[i]dentification of all Participants which have expressed an interest in being considered for the acquisition." 13 C.F.R. § 124.502(c)(11), (14). Contracts entered into pursuant to Section 8(a) may either be sole-source awards or awards won through competition with other participants in the procurement. 13 C.F.R. § 124.501(b).

SBA's acceptance of an 8(a) procurement is governed by 13 C.F.R. § 124.503. Of particular relevance to Infiniti's bid protest, 13 C.F.R. § 124.503(e) provides that

> Except for requirements for architectural and engineering services, SBA will not authorize formal technical evaluations for sole source 8(a) requirements. A procuring activity:
>
> (1) Must request that a procurement be a competitive 8(a) award if it requires formal technical evaluations of more than one Par-

ticipant for a requirement below the applicable competitive threshold amount; and (2) *May conduct informal assessments of several Participants' capabilities* to perform a specific requirement, *so long as the statement of work for the requirement is not released* to any of the Participants being assessed.

(Emphasis added.) Further, SBA will not accept the procurement if limiting circumstances exist, as described in 13 C.F.R. § 124.504, including where "[t]he procuring activity . . . expressed publicly a clear intent to reserve the procurement as a small business or small disadvantaged business (SDB) set-aside prior to offering the requirement to SBA for an award as an 8(a) contract," 13 C.F.R. § 124.504(a), and where "[t]he procuring activity competed a requirement among Participants prior to offering the requirement to SBA and receiving SBA's formal acceptance of the requirement." 13 C.F.R. § 125.504(b).

### B. *Prior Awards to Infiniti*

This case arises from HUD's requirement for internal and external website support services for PIH. *See* AR 2–000006 (Market Research Questionnaire). Under two sequential Section 8(a) sole-source contracts, Infiniti performed these services from 2005 until the second contract expired on September 19, 2009. AR 9C–000351 at ¶¶ 3–5 (Decl. of Sharon L. Kadinger, Contract Specialist, Western Field Office of Contracting Operations, HUD (Sept. 11, 2009)); [6] AR 2–000006 to 000008 (Market Research Questionnaire); AR 2–000009 (Request to Consider the Following Vendors for 8(a) Sole Source Procurement). Infiniti is a Service–Disabled–Veteran–Owned ("SDVO") and African–American–owned company. AR 2–000020 (Vendor Information for PIH Internet/ HUDWeb/ PHA Plans Support Procurement).[7]

---

**6.** Although Ms. Kadinger's declaration post-dated the procurement action, the declaration was submitted in connection with the protest before GAO, and thus the government included it in the administrative record. *See* RCFC App. C, ¶ 22(u); *see also Holloway & Co. v. United States,* 87 Fed.Cl. 381, 391–392 (2009) (applying RCFC Appendix C, ¶ 22(u), to accept as part of the administrative record materials that were incorporated into the record developed before GAO in a prior protest of the pertinent award); *cf. Al-*

*lied Technology Group, Inc. v. United States,* 92 Fed.Cl. 226, 229–31, 2010 WL 1388162, at *3–4 (2010) (applying RCFC Appendix C, ¶ 22(u), and adjusting the administrative record to accept some, but reject other, materials that were generated for, and filed in, a prior protest before GAO).

**7.** Infiniti avers that in February 2008, its owner, Gus Bell, met with Lafonda Lewis, HUD's Senior Contract Oversight Specialist at the time. AR

## C. *HUD's Procurement Activities*

Effective January 30, 2007, SBA entered into a Partnership Agreement with HUD that provided for delegation of SBA's authority to enter into prime contracts under Section 8(a) of the Small Business Act. *See* AR 9D–000355 to 000361 (Partnership Agreement). By that Agreement, SBA "delegate[d] only the contract execution function," while SBA "remain[ed] the prime contractor on all 8(a) contracts, and the 8(a) participant remain[ed] SBA's subcontractor." *Id.* at 000356 (¶ IV.A.1). In entering into the Agreement, HUD bound itself to "adhere to all provisions of contractual assistance identified in 13 C.F.R. parts 124.501 through 124.520, as well as the applicable provisions of FAR 48 part 19." *Id.* at 000358 (¶ IV.B.2). The Agreement remained in effect until September 30, 2009. *Id.* at 000360 (Art. V).

During the Spring of 2009, HUD began developing a so-called "vendor list" for the PIH contract, which was completed on June 10, 2009. *See* AR Supp. 15–000512 to 000514 (Request to Consider the Following Vendors for an 8(a) Direct Award (June 10, 2009)).[8] Shortly before that date, on May 18, 2009, HUD issued a notice advising of a planned "PIH Internet/HUD Web/PHA Plan Support [Contract]," for services to "perform daily maintenance and updates to existing web pages and documents, create new sub-sites within PIH's internal and external websites, perform marketing, [develop and execute] outreach and support strategies," and "[c]onvert files to portable document format and track are [sic] documents." AR 3–000021 to 000022 (May Forecast). Notably, the May Forecast projected that the award would be a "Competitive 8(a) Set–Aside (Service Disabled/Veteran Owned)." *Id.* at 000022. Several weeks later, on June 8, 2009, HUD issued a revised notice for the same projected award, which differed from the prior notice only with respect to the acquisition strategy; that strategy was shown on the June Forecast as "8(a) Direct (Service Disabled/Veteran Owned)." AR 3–000023 to 000024 (June Forecast).[9] The estimated contract value stated in both notices was between $500,000 and $2,000,000 for a one-year contract plus two option years. AR 3–000022 (May Forecast); AR 3–000024 (June Forecast).

On June 11, 2009, Susan Adams, Contract Oversight Specialist for HUD and PIH, e-mailed eleven vendors to schedule interviews with a panel comprised of herself and two

---

12A–000417 (GAO Protest (Aug. 27, 2009)); *see also* Pl.'s Mem. in Support of its Mot. for Judgment on the Administrative Record at 3 ("Pl.'s Mem."). In the proceedings before GAO, Infiniti represented that Ms. Lewis informed Mr. Bell that she would no longer be overseeing the Infiniti contract and that Cedric Brown, PIH's Chief Contract Oversight Officer, had told Ms. Lewis that Infiniti would not be awarded the follow-on contract because it was the incumbent contractor. AR 12A–000417 (GAO Protest). Infiniti also represented that on February 28, 2009, Mr. Bell and Mr. Brown met to discuss the follow-on contract and Mr. Brown stated that "Infiniti was doing a good job" and "he would consider allowing Infiniti to compete for the contract." *Id.* at 000417 to 000418. Thereafter, Infiniti states that a meeting was arranged with Annette Hancock, HUD's Acting Chief Procurement Officer, at which Infiniti inquired whether it was also HUD's policy to not award follow-on contracts to incumbents, and that Ms. Hancock stated no such policy existed. *Id.* at 000418. Reportedly, during a subsequent meeting, Ms. Hancock informed Mr. Bell that she had spoken to Mr. Brown and that he "would be including Infiniti in the contract follow-on 8 ( [a] ) competition." *Id.*

8. As discussed *infra*, the court invoked RCFC Appendix C, ¶ 24, to request that the government supplement the record to flesh out obvious gaps in the documentary materials that had been provided. The government cogently and promptly responded with the requested additional materials, as a supplement to the administrative record. References to the supplemental record will be to "AR Supp. ——."

9. The notice dated June 8, 2009 did not state that the contract would be awarded on a sole-source basis; rather, by indicating that the award would be "direct," HUD meant that it would award the contract directly to a Section 8(a) firm, in accord with its delegation. *See* United States Department of Housing and Urban Development, Office of the Chief Procurement Officer, Class Deviation to Federal Acquisition Regulation Subpart 19.8 and Part 52, Section 8(a) Awards, at 2 (Sept. 5, 2007) ("FAR 19.800 paragraph (f) is replaced with the following: ... Under the Partnership Agreement, a contract may be awarded directly to an 8(a) firm on either a sole source or competitive basis."). The government contended that the forecast was ambiguous on this point and that Infiniti should have asked HUD for clarification. Hr'g Tr. 30:22 to 31:8, 35:6–12.

other HUD employees, Reginald Strayhorn and Kevin Jones. AR 6A–000103 (E-mail from Ms. Adams to Mr. Strayhorn and Mr. Jones (June 11, 2009)); AR 6B–000104 to 6H–000114 (E-mails from Ms. Adams to eleven vendors including Infiniti and Ideogenics (all dated June 11, 2009)). The e-mails sent to the eleven vendors were virtually identical, and each began: "This e-mail confirms that [vendor company's name] will present its capabilities as they relate to the attached draft SOW." *See, e.g.,* AR 6B–000104 (E-mail from Ms. Adams to Ideogenics (June 11, 2009)). A draft "SOW," or statement of work, was attached to each e-mail along with a list of fourteen "interview questions to determine suitability of potential contractors." *See, e.g.,* AR 6H–000114 to 000118 (E-mail from Ms. Adams to Sayres and Assocs. Corp. (June 11, 2009)) (showing "PIH Internet–PHA Plans Support SOW 6–11–09(2) draft.docx" and "Internet WebsitePlans Interview questions 0611.doc" as attachments); AR 2–000002 to 000005 (Interview Questions to Determine Suitability of Potential Contractors for PIH Internet/ HUD Web/ PHA Plans Support Project) ("Interview Questions"). The e-mails also requested that vendors "provide resumes of key personnel . . . [and] the names and addresses of three references for work completed within the past 3 years[,][i]f possible, . . . before the presentation." *See, e.g.,* AR 6B–000104 (E-mail from Ms. Adams to Ideogenics). Interviews were scheduled for June 15, 17, and 22, 2009. AR 6A–000103 (E-mail from Ms. Adams to Mr. Strayhorn and Mr. Jones).

Some of the interviewees, as well as other firms who had expressed an interest in the procurement in connection with HUD's development of the vendor list, posed queries to Ms. Adams regarding the acquisition strategy and process. *See, e.g.,* AR Supp. 16–000562 (E-mail from Ideogenics to Ms. Adams (May 27, 2009)) ("I understand that this is going to be an 8(a) direct award, correct?"); AR Supp. 17–000657 (E-mail from Jackie Robinson & Associates to Ms. Adams (June 22, 2009)) ("inquiring what the process was"); AR 7B–000124 (E-mail from Shiva Information Technology Services to Ms. Adams (June 22, 2009)) ("I am not clear about the procurement strategy listed as 8(a)

direct [ ] and also Service Disabled/Veteran Owned. We are an 8(a) company but not SDVOB. Will we qualify for this procurement?"). In response to questions regarding whether Service Disabled/Veteran Owned ("SDVO") was a requirement, Ms. Adams stated that SDVO was "just a preference." *See, e.g.,* AR Supp. 16–000530 (E-mail from Ms. Adams to Imagine One Technology (Apr. 2, 2009)); *but see* AR Supp. 17–000626 (E-mail from Ms. Adams to Mr. Strayhorn (June 16, 2009)) (additional vendor unlikely to be added for review because not a SDVO).

Infiniti's presentation to the panel was scheduled for June 22, 2009. *See* AR 6G–000112 (E-mail from Ms. Adams to Infiniti (June 11, 2009)). That presentation included information on the identity and qualifications of key members of its "project support team," the company's major accomplishments, and the benefits of selecting Infiniti for the follow-on contract. AR 7F–000139 to 000149 (Infiniti's Presentation for HUD (June 22, 2009)). Infiniti submitted a list of references and the resumes of five of the six members of its "project support team," *see id.* at 000143, Vinay P. Jain, Project Manager and Technical Lead, Maurice L. Chesley, Alternative Project Manager, Adam Young, Senior Analyst and Web Developer, Charmaine Patterson, Senior Analyst and Web Developer, and Kimberly Williams, Analyst and Web Developer. AR 7F–000153 to 000163 (Resumes of Mr. Jain, Mr. Chesley, Mr. Young, Ms. Patterson, and Ms. Williams, plus references). The government has characterized as "market research" the process by which vendors made presentations to HUD in response to a draft statement of work and submitted answers to a set of interview questions and resumes of key personnel. *See, e.g.,* Def.'s Mot. to Dismiss, or, in the Alternative, Def.'s Resp. to Pl.'s Mot. for Judgment upon the Administrative Record and Cross Mot. for Judgment upon the Administrative Record at 3 ("Def.'s Cross-Mot.").

The panel's evaluation of the vendors' presentations was relatively formal but nonetheless did not reflect the full panoply of steps customarily attendant to a competitive procurement. One of the interview panelists,

Mr. Strayhorn, employed a specific set of "evaluation factors" and a scoring system to rate the capabilities of the eleven potential contractors. AR 14D–000500 (Decl. of Mr. Strayhorn, Information Technology Project Manager, PIH, HUD (Nov. 17, 2009)).[10] Mr. Strayhorn stated in his declaration that the evaluation criteria and scoring system were revised from a document he had used while acting as a " 'Technical Evaluation Panelist' for a different HUD contract." *Id.* Mr. Strayhorn evaluated Infiniti and the other ten vendors in four areas: (1) interview questionnaire and technical approach; (2) project management and staffing approach; (3) past performance on similar projects; and (4) whether the vendor was Service Disabled Veteran Owned. AR 13A–000480 (Mr. Strayhorn's Comments for Recommendation for 8(a) Direct Award). For each of the first three areas evaluated, Mr. Strayhorn awarded the vendors between 1 and 4 points with 1 point being a rating of "poor" and 4 being "excellent." *Id.* With regard to the fourth area evaluated, whether the vendor was service disabled veteran owned, Mr. Strayhorn awarded one point to vendors who were veteran owned and two points to vendors who were both service disabled and veteran owned; vendors who were not veteran owned received zero points. *Id.* Using this system, Mr. Strayhorn awarded Infiniti fourteen points, the most awarded to any of the vendors; Ideogenics was ranked by him fourth overall with eleven points. *Id.* at 000480 to 000484. Mr. Strayhorn's conclusions were as follows: "If the veteran preference is to be honored, then my choice for this award is Infiniti. If a new company is to be selected, then I will choose Ideogenics. In both cases,

I pick Infiniti as my overall choice." *Id.* at 000479.

The observations Mr. Strayhorn submitted to Ms. Adams included the criteria and evaluations of the vendors. AR 13A–000478 (E-mail from Mr. Strayhorn to Ms. Adams (July 14, 2009)). In a *post hoc* declaration submitted to the court, Ms. Adams stated that although "parts of Mr. Strayhorn's narratives were used in the panel's narrative summary" which was submitted to Mr. Brown for his recommendation to Assistant Secretary Sandra B. Henriquez, the individual responsible for approving PIH's suggested contractor for transmission to SBA's Contracting Office, "[Mr. Strayhorn's] evaluation scheme and scoring system were not incorporated in the market research panel's narrative summary." AR 14B–000496 (Decl. of Ms. Adams, Senior Contract Oversight Specialist, PIH, HUD (Nov. 13, 2009)). A *post hoc* declaration submitted by Mr. Jones stated that "[a]t no time was I instructed to use evaluation factors in the market research process, and at no time during the market research process was I instructed that the Procurement was a competitive acquisition." AR 14C–000498 (Decl. of Mr. Jones, Management Information Specialist, PIH, HUD (Nov. 13, 2009)); *see also* AR 14B–000495 to 000496 (Decl. of Ms. Adams) (same). The supervisor of the panel, Mr. Brown, submitted a *post hoc* declaration to the same effect, stating that "[a]t no time during the course of this procurement did I ask Ms. Adams, Mr. Jones[,] or Mr. Strayhorn to use any evaluation criteria, or assign a number score to any of the firms." AR 14A–000493 (Decl. of Mr. Brown, Chief Contract Oversight Officer, PIH, HUD (Nov. 13, 2009)).

In these circumstances, the reviewing court should be mindful to examine critically any *post hoc* rationalizations for the agency action. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Co-Steel Raritan, Inc. v. International Trade Comm'n,* 357 F.3d 1294, 1316 (Fed.Cir.2004); *PGBA, LLC v. United States,* 60 Fed.Cl. 196, 204 (2004), *aff'd,* 389 F.3d 1219 (Fed.Cir.2004).

---

**10.** Declarations by members of the panel were executed in mid-November 2009, after this case had been filed, and were included by the government in the administrative record. *See* AR 14B–000495 to 14D–000500. However, the declarations themselves manifestly were not part of the contemporaneous record of this procurement. Accordingly, this is an instance where "supplementary declarations and testimony at trial may reflect wisdom gained by hindsight and may not represent individuals' actual bases for making decisions during the procurement." *Systems Plus, Inc. v. United States,* 69 Fed.Cl. 757, 765 n. 5 (2006).

In due course, on July 28, 2009, Mr. Brown submitted a memorandum to Assistant Secretary Henriquez requesting her approval of a recommendation that Ideogenics be awarded the PIH contract. AR 8E–000331 (Mem. from Mr. Brown to Ms. Henriquez, Assistant Secretary, PIH (July 28, 2009)). The memorandum recited strengths and weaknesses of each vendor and the overall conclusion that Ideogenics should be awarded the contract. *Id.* at 000332 to 000345. On August 7, 2009, Assistant Secretary Henriquez approved the recommendation of Ideogenics for the contract. *Id.* at 000331. HUD then sought SBA's authorization to negotiate a contract with Ideogenics, AR 9B–000349 to 000350 (Offer Letter (Aug. 5, 2009)), which SBA granted by a letter dated August 14, 2009. AR 9A–000347 to 000348 (Letter from SBA to Ms. Kadinger (Aug. 14, 2009)). On August 17, 2009, HUD notified Infiniti that it intended to award the PIH contract to Ideogenics. AR 12A–000439 (E-mail from Ms. Kadinger to Mr. Bell (Aug. 17, 2009)). Infiniti then requested a debriefing, which HUD denied, advising that "[d]ebriefings are not required under the Market Research Process." AR 12A–000419 to 000420 (GAO Protest). On August 27, 2009, Infiniti filed a protest with the GAO. *Id.* at 000414 to 000439 (GAO Protest).

### D. Protest Before GAO

In its protest filed with GAO, Infiniti claimed that HUD awarded "an illegal sole source contract without affording Infiniti the protections and procedures set forth in the FAR supporting such anti-competitive awards." AR 12A–000414 to 000415 (GAO Protest). Alternatively, Infiniti argued that "to the extent that the Comptroller General finds that the award to Ideogenics was done on a competitive basis, the award decision must be overturned because it was made on the basis of unstated evaluation criteria and not on the basis of a fair and reasonable evaluation." *Id.* at 000415. HUD responded by moving for dismissal based upon lack of jurisdiction and Infiniti's failure to state legally sufficient grounds for the protest. AR 12B–000440 (Government's Request for Dismissal of GAO Protest (Sept. 11, 2009)). On September 24, 2009, GAO dismissed the protest, AR 12F–000476 (GAO Decision (Sept.

24, 2009)), concluding that "no solicitation was issued" because "there was neither a finalized statement of work [released to all the participants] nor a list of evaluation factors for award." *Id.* GAO considered that the draft SOW that was provided to the eleven vendors prior to the interviews constituted a "synopsis of the anticipated requirement," and viewed the information requested by HUD on each company's experience, key personnel, and other capability information as falling within the ambit of permissible market research allowed by 13 C.F.R. § 124.503(e)(2). *Id.* at 000476 to 000477.

### STANDARDS FOR DECISION

■ This court adheres to the standards specified in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, when deciding a bid protest. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under the APA, this court may set aside an agency decision such as an award of a contract if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential" to the agency's procurement decision, *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed. Cir.2000), and the court accords the agency's decision a "'presumption of regularity.'" *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1085 (Fed.Cir.2001) (quoting *Citizens to Preserve Overton Park,* 401 U.S. at 415, 91 S.Ct. 814, *abrogated in part by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (abrogating the portion of *Overton Park* that recognized the APA as an independent grant of subject matter jurisdiction)).

■■ The court reviews the agency's decision based upon the administrative record of the procurement. *See* RCFC 52.1(a); *Bannum,* 404 F.3d at 1355–57. If the agency's action "evinc[es] rational reasoning and consideration of relevant factors," the court will sustain the action. *Advanced Data Concepts,* 216 F.3d at 1058. The agency's deci-

sion will be upheld even if the court might have applied the procurement regulations in a different fashion had the court been in the agency's position. *See Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989); *see also Lumetra v. United States,* 84 Fed.Cl. 542, 549 (2008) ("[T]he court 'will not second guess the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement.' " (quoting *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir. 1996))). However, where the agency " 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' " then its decision will be set aside for lack of a rational basis. *Keeton Corrs., Inc. v. United States,* 59 Fed.Cl. 753, 755 (2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). To prevail, the protesting party must establish that "the procurement official's decision lacked a rational basis" or that "the procurement procedure involved a violation of regulation or procedure." *Centech Group, Inc. v. United States,* 554 F.3d 1029, 1037 (Fed.Cir.2009) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001)); *accord Lumetra,* 84 Fed.Cl. at 549.

## THE ADMINISTRATIVE RECORD

Infiniti filed its complaint in this court on November 3, 2009. The administrative record was provided November 20, 2009, and the parties thereafter submitted their cross-motions and briefs on an expedited basis. Upon review of the briefs in light of the administrative record, and before the case had been submitted for decision, the court concluded that certain documentary materials had apparently been overlooked or omitted from the record as filed. Accordingly, in an order dated March 10, 2010, the court invoked RCFC Appendix C, ¶ 24,[11] and requested that the government produce eight additional categories of documents for inclusion in the administrative record. *See R & D Dynamics Corp. v. United States,* 80 Fed.Cl. 715, 717 n. 3 (2007) (discussing orders by the court to provide and supplement the administrative record in accord with RCFC Appendix C); *see also OTI Am., Inc. v. United States,* 68 Fed.Cl. 108, 119 (2005) (ordering the government to file the administrative record pursuant to RCFC Appendix C, ¶¶ 21–24). The government submitted the requested materials, consisting of a written response and 223 pages of documents, as a supplement to the administrative record prior to the hearing held on March 16, 2010, at which the court addressed the cross-motions for judgment upon the administrative record and the government's motion to dismiss.

## ANALYSIS

### A. *A Question of Waiver*

◼ The government has moved to dismiss this case, arguing that Infiniti has waived its right to challenge the award in this matter because Infiniti filed its bid protest after HUD awarded the contract to Ideogenics. Def.'s Cross–Mot. at 13–15.[12] The government relies on *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308 (Fed. Cir.2007), to support its waiver argument. The procurement at issue in *Blue & Gold Fleet* was for ferry transportation to, and concessions at, Alcatraz island. *Id.* at 1311.

---

11. RCFC Appendix C, ¶ 24, requires that "[a]ny additional documents within the administrative record [beyond those already produced as part of the record pursuant to RCFC Appendix C, ¶¶ 21–23] must be produced at such times as may be agreed to by the parties or ordered by the court."

12. Initially, the government also moved to dismiss Infiniti's complaint on the grounds of lack of subject matter jurisdiction, arguing that Infiniti is not an "interested party," Def.'s CrossMot. at 10–13, as required by statute to pursue a bid protest. *See* 28 U.S.C. § 1491(b)(1) (granting this court "jurisdiction to render judgment on an action by *an interested party* objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement" (emphasis added)). Subsequently, the government withdrew this contention. *See* Def.'s Reply at 1 n. 1; Hr'g Tr. 28:14–16.

After having lost the award, Blue & Gold Fleet filed a protest alleging that the contract awardee had failed to include in its bid "the wages and benefits for its employees [as] required by the Service Contract Act." *Id.* at 1312. The Federal Circuit affirmed the decision of this court that held that Blue & Gold Fleet was actually challenging the terms of the solicitation itself, which "did not include any requirement that the bidders consider the Service Contract Act," and thus that it had waived its opportunity to protest. *Id.* at 1313; *see id.* at 1314 (citing 4 C.F.R. § 21.2(a)(1) ("Protests based upon alleged improprieties in a solicitation which are apparent prior to ... the time set for receipt of initial proposals shall be filed prior to ... the time set for receipt of initial proposals.")). Waiver occurs when "a party who has the opportunity to object to the terms of a government solicitation containing a patent error ... fails to do so prior to the close of the bidding process," thus "waiv[ing] its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Id.* at 1313. In essence, " '[v]endors cannot sit on their right to challenge what they believe is an unfair solicitation, roll the dice and see if they receive the award and then, if unsuccessful, claim the solicitation was infirm.' " *Id.* at 1314 (quoting *Argencord Mach. & Equip. v. United States*, 68 Fed.Cl. 167, 175 n. 14 (2005)).

▮ The application of *Blue & Gold Fleet* to this bid protest action turns on whether ambiguities found in the procurement documents which underlie Infiniti's claims were "patent," thus triggering Infiniti's duty to seek clarification from the government prior to the scheduled interviews. *See Blue & Gold Fleet*, 492 F.3d at 1313. Arguably, the forecast issued by HUD on June 8, 2009 was ambiguous as to whether the contract was to be awarded on a competitive or sole-source basis. *See supra*, at 7. Indeed, other contractors e-mailed Ms. Adams for clarification regarding the acquisition strategy. *See, e.g.*, AR Supp. 16–000562 (E-mail from Ideogenics to Ms. Adams (May 27, 2009)) ("I understand that this is going to be an 8a direct award, correct?"). However, Infiniti's protest is not based on this aspect of the notices; rather, Infiniti argues that what HUD did in its subsequent actions to determine the awardee contravened SBA's regulations. Infiniti had no reason to question HUD's notices because it qualified under Section 8(a) and was a SDVO Small Business. Accordingly, Infiniti did not waive its right to mount a challenge based upon SBA's regulations to an award made under Section 8(a) to a non-SDVO.

### B. Questions of Compliance with SBA's Rules

#### 1. Applicability of SBA's rules.

Section 8(a) authorizes the creation of a Minority Small Business and Capital Ownership Development program ("8(a) BD" program). 13 C.F.R. § 124.1. The stated purpose of the 8(a) BD program is "to assist eligible small disadvantaged business concerns compete in the American economy through business development." *Id.* To be eligible for admission to the 8(a) BD program, a business concern must be "a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of the United States, and which demonstrates potential for success." 13 C.F.R. § 124.101. As discussed previously, "[w]here appropriate," SBA will delegate to a federal agency the ability to contract directly with the 8(a) business, but "to receive and retain a delegation ..., a procuring activity must report all 8(a) contract awards, modifications, and options to SBA." 13 C.F.R. § 124.501(a); *see also* 13 C.F.R. § 124.503(a)(4)(ii) ("Where SBA has delegated its 8(a) contract execution functions to an agency, SBA may authorize the procuring activity to award an 8(a) contract without requiring an offer and acceptance of the requirement for the 8(a) program."). The delegation carries with it the obligation to adhere to SBA's rules for 8(a) direct awards. *See* AR 9D–000358 (Partnership Agreement, ¶ IV.B.2); Hr'g Tr. 58:8–21. This responsibility includes the obligation of the contracting officer to "consider setting aside the requirement for HUBZone, 8(a) or SDVO SBC participation before considering to set aside the requirement as a small business set-aside." 13 C.F.R. § 124.503(j).

## 2. HUD's procurement actions.

Although HUD's initial approach to the procurement was to award the contract as a "[c]ompetitive 8(a) [s]et [a]side," see AR 3–000022 (May Forecast), this strategy was changed to "8(a) direct." See AR 3–000024 (June Forecast). An 8(a) direct award can be made on either a competitive or a sole-source basis, and the final forecast in June was consequently ambiguous on the basis for award within the ambit of SBA's 8(a) rules. By contrast, both the May and June forecasts were specific that the "Service Disabled/Veteran Owned" criterion would apply because that notation appeared in parentheses under the acquisition strategy in both notices. Five of the eleven vendors included on the vendor list signed by Mr. Brown on June 10, 2009 were SDVO. See AR Supp. 15–000514 (Request to Consider the Following Vendors for an 8(a) Direct Award).

Infiniti's primary challenge to the award focuses on HUD's compliance with SBA Regulation 13 C.F.R. § 124.503(e), which allows "informal assessments of several Participants' capabilities to perform a specific requirement," rather than a formal competition, "so long as the statement of work for the requirement is not released to any of the Participants being assessed." Infiniti's chief argument with regard to this regulation is that HUD released a statement of work to the eleven contractors who participated in the "market research process," thus effectively conducting an illegal competition in violation of the rule. See Pl.'s Resp. at 9–12. The government responded that the statement of work released to the eleven participants was a "draft," and was referred to as such in the e-mails sent on June 11, 2009 to the eleven participants. See Def.'s Reply at 4 ("The draft statement of work ... was not the actual statement of work for the contract that HUD negotiated with Ideogenics."); but cf. AR Supp. at 17–000606 (E-mail from Ms. Adams to Advantage Industries, Inc. (June

12, 2009)) ("The date [for your presentation] is June 22 @ 1 pm. Did you receive my email with the SOW and interview questions?").

Whatever were HUD's intentions in releasing the so-called "draft statement of work," some uncertainty and confusion was created by the process, as evidenced by the multiple e-mail queries from participating entities to Ms. Adams on the subject. See, e.g., AR 7B–000124 (E-mail from Shiva, Inc. to Ms. Adams (June 22, 2009)) ("I am not clear about the procurement strategy."); AR 7K–000265 (E-mail from Ideogenics to Ms. Adams (May 27, 2009)) ("I understand that this is going to be an 8(a) direct award, correct?"); AR Supp. 16–000593 (E-mail from Jackie Robinson & Associates to Ms. Adams (June 9, 2009)) ("Will we have a[ ] SOW [prior to the presentation] or are we just expected to give the audience our experience in Web development and maintenance?"); AR Supp. 17–000654 (E-mail from Jackie Robinson & Associates to Ms. Adams (June 18, 2009)) ("Can you help me understand the process they will use to select the vendor? Do the three of you who interviewed us make a set of recommendations to Denver and then they select the vendor, or how is the selection done?").[13]

The court has relatively little precedent upon which to draw in determining whether HUD's release of the so-called "draft statement of work" contravened the pertinent SBA regulation, 13 C.F.R. § 124.503(e)(2). The parties referred specifically to two decisions by the General Services Administration Board of Contract Appeals—Dynamic Decisions, Inc. v. Department of Health & Human Servs., 95–2 B.C.A. ¶ 27,732, GSBCA Nos. 13170–P & 13171–P, 1995 WL 314827 (May 4, 1995), and Electronic Sys. & Assocs., Inc. v. Department of the Air Force, 93–1 B.C.A. ¶ 25,278, GSBCA No. 11833–P, 1992 WL 165562 (July 15, 1992)[14]—and one deci-

13. As a result of the government's response to the court's request for supplementation of the administrative record pursuant to RCFC Appendix C, ¶ 24, the court has a significantly more extensive record than that which was before GAO at the time of its decision.

14. In 1984, the General Services Administration Board of Contract Appeals ("GSBCA") was granted jurisdiction to hear bid protest cases, exclusive as to federal data processing contracts. See Competition in Contracting Act of 1984, Pub.L. No. 98–369, § 2713, 98 Stat. 1175, 1182 (1984) (codified as amended at 40 U.S.C.

sion by the Comptroller General, *Nomura Enter. Inc.*, 93–2 CPD ¶ 170, B–254581, 1993 WL 376467 (Comp.Gen. Sept.15, 1993). Each of these cited decisions are instructive.

*Dynamic Decisions* and *Electronic Systems* hold that when a statement of work is given to vendors prior to the time that a review is undertaken, the procurement must be competed. *See Dynamic Decisions*, 1995 WL 314827, 1995 GSBCA LEXIS 167, at *47 (sustaining a protest against the Public Health Service where the agency invited five companies to make oral presentations based on a statement of work and failed to inform SBA of its actions when recommending sole-source awards);[15] *Electronic Sys.*, 1992 WL 165562, 1992 GSBCA LEXIS 263, at *14 ("Whether the Air Force's review was considered to be either formal or informal, the procurement [should have been] competed because the statement of work had been given to vendors prior to the time that the review occurred."). In *Nomura*, upon which GAO relied in dismissing Infiniti's protest, GAO commented that a synopsis of the contractual requirement published in the Commerce Business Daily amounted to "only a short outline of the agency's expected requirements," and it concluded that such an outline was not the same as a statement of work. *Nomura*, 1993 WL 376467, at *2. In light of these decisions, the question at hand becomes whether the so-called "draft statement of work" transmitted to the eleven vendors by HUD on June 11, 2009, prior to their interviews, constituted a "statement of work" within the meaning of the SBA regulation or was instead merely a synopsis of the procurement requirement as GAO believed.

Factually, the work statement made part of the Ideogenics contract does not differ in any material respect from the draft statement of work sent by e-mail to the vendors. Vendors were provided with Section C.1. entitled "Background," Section C.2. entitled "Purpose and Objective," and Section C.3. entitled "Scope of Work." Each of these sections is virtually identical, word for word, in both documents, although the Scope of Work is renumbered as Section C.9. in the actual contract that was awarded Ideogenics. *Compare* AR 6H–000115 to 000118 ("draft SOW"), *with* AR 11–000370 to 000374 (Ideogenics Contract). Sections C.3. through C.8. in the Ideogenics contract do not appear in the draft statement of work sent to vendors, but those sections relate to, respectively, "Abbreviations, Definitions, and Applicable Documents/Publications" (§ C.3), "Government Furnished Property" (§ C.4), "Contractor Furnished Items and Services" (§ C.5), "36 C.F.R. § 1194.31, ... Access Board [ ] Standards" (§ C.6), "Deliverables" (§ C.7), and "General" (§ C.8). *Compare* AR 6H–000115 to 000118 (draft SOW), *with* AR 11–000371 to 000373 (Ideogenics Contract). Factually, these sections are ancillary to the scope of work to be performed under the contract. The government argues that the "Deliverables" section could hardly be ancillary to the statement of work, *see* Hr'g Tr.

§ 759(f)(1) (1988)) (amending the Brooks Act, Pub.L. No. 89–306, § 111, 79 Stat. 1127 (1965)); *see also U.S. West Commc'ns. Servs., Inc. v. United States*, 940 F.2d 622, 625–31 (Fed.Cir.1991) (reviewing a GSBCA decision rendered in a bid protest under the Brooks Act and holding that bid-protest jurisdiction inhering in GSBCA under that Act might be appropriately exercised where a government prime contractor was serving as the government's purchasing agent); *Blue Water Envtl., Inc. v. United States*, 60 Fed.Cl. 48, 53 (2004) (applying the decision in *US West*). In 1996, GSBCA's bid protest jurisdiction was elided with the enactment of the National Defense Authorization Act, Pub.L. No. 104–106, § 5101, 110 Stat. 186, 680 (1996), shortly before the expansion of this court's bid-protest jurisdiction via the adoption of the Administrative Dispute Resolution Act, Pub.L. No. 104–320, § 12(a), 110 Stat. 3870, 3874 (Oct. 19, 1996) (adopting redesignated 28 U.S.C. § 1491(b)(1)).

For details regarding pre-repeal statutory adjustments in GSBCA's bid-protest jurisdiction, *see* William L. Murphy, *The Federal Circuit and the GSBCA: Review of Protest Decisions*, 40 Am. U.L.Rev. 1065 (1991). On January 6, 2007, the GSBCA ceased to exist, and its cases were transferred to the newly created Civilian Board of Contract Appeals. *See* National Defense Authorization Act for Fiscal Year 2006, Pub.L. No. 109–163, § 847, 119 Stat. 3136, 3391 (2006).

15. In *Dynamics Decisions*, the GSBCA also concluded that evaluation by a panel of agency officials of capability statements, resumes of proposed personnel, references, and oral presentations made to the panel "constitute[d] formal technical evaluations." 1995 WL 314827, 1995 GSBCA LEXIS 167, at *47.

31:22 to 32:2, but in the Ideogenics contact that section consists of a single provision stating only the ministerial requirement that "[t]he contractor shall deliver all drafts and final documents in a hard copy and e-mail copy to the G[overnment] T[echnical] R[epresentative] and G[overnment] T[echnical] M[onitor]." AR 11–000373 (Ideogenics Contract, § C.7.1).

█ Substantively, the scope of work to be performed under the contract is divided into two tasks: Task 1 deals with "daily internet/intranet support for PIH Headquarters offices," AR 6H–000116 (draft SOW); AR 11–000373 (Ideogenics Contract); Task 2 addresses "PHA Plan internet/intranet maintenance and posting support, system process enhancements and [maintenance] [of] on-going processes on a daily basis." AR 6H–000117 (SOW); AR 11–000374 (Ideogenics Contract). The recitation of these tasks is virtually identical in both the draft SOW and the contract as awarded. With regard to the Task 1, apart from a few word changes, the two documents are identical. The descriptive text for Task 2 is also virtually identical, except that the draft SOW contained an additional requirement—to "monitor, process, and resolve all email inquires in the 'pihphalans' inbox"—that appears to have been omitted from the contract awarded to Ideogenics. *Compare* AR 6H–000117, § 3.2.1 (draft SOW), *with* AR 11–000374 (Ideogenics Contract). Accordingly, the court finds that the document HUD e-mailed to the eleven vendors constituted a statement of work in contravention of SBA Regulation 13 C.F.R. § 124.503(e)(2), making the award of the PIH contract to Ideogenics contrary to law.

█ A second challenged aspect of the procurement at issue tests HUD's award against its published strategy for the procurement. In both the May and June forecasts, HUD listed "Service Disabled/Veteran Owned" in parentheses beneath the acquisition strategy. This listing engendered confusion, and some of the vendors posed ques-

tions to Susan Adams on this point. *See supra*, at 7. As noted previously, Ms. Adams responded that SDVO was a "preference." That SDVO was just a preference was not evident from the forecasts; instead, the forecasts denote the opposite conclusion: that SDVO was a mandatory qualification. The government's contention that the forecasts were at least ambiguous on this point, *see* Hr'g Tr. 36:23 to 37:16, reads more into the forecasts than appears on their face. Moreover, establishing such a qualifying requirement would have been consistent with 13 C.F.R. § 124.503(j), quoted *supra*, which required HUD to consider a set aside for disadvantaged firms, including SDVO entities. Further, HUD's responses to the queries regarding the acquisition strategy were not provided to the non-inquiring participants, only to those who raised the questions. *See* Hr'g Tr. 13:23 to 15:5. Infiniti and other entities who qualified as SDVOs thus had no inkling of HUD's consideration of non-SDVO firms. HUD's actions with regard to the SDVO "preference" were consequently arbitrary and capricious, and prejudicial to those vendors such as Infiniti who assumed, reasonably, that there was no ambiguity as to whether SDVO was a requirement.[16] Accordingly, the award of the PIH contract to Ideogenics, a non-SDVO, founders on this ground as well.

Having found HUD's evaluation and recommendation of Ideogenics to be contrary to law and arbitrary and capricious on two separate and independent grounds, it is not necessary to reach Infiniti's claims that other aspects of the procurement were unlawful, such as the rating of vendors or bias against Infiniti.

## CONCLUSION

For the reasons stated, Infiniti's motion for judgment on the administrative record is GRANTED. The government's motions to dismiss and for judgment on the administra-

---

**16.** To establish prejudice, and thus grounds for relief under 28 U.S.C. § 1491(b)(2), a protestor must "demonstrate more than a 'mere possibility that [it] would have received the contract but for the error[s] [in the procurement process].'" *Asia Pac. Airlines v. United States*, 68 Fed.Cl. 8,

18 (2005) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996)). Because Infiniti was the highest rated vendor by at least one member of the review panel and was qualified as a "SDVO" entity, it has made the requisite showing of prejudice.

tive record are DENIED. The award of the PIH contract to Ideogenics shall be set aside. The clerk shall enter judgment for Infiniti in accord with this decision. Infiniti is awarded its costs of suit.

The parties were requested to review this decision and to file proposed redactions on or before April 8, 2010. No redactions were sought.

It is so ORDERED.